IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Doylan V. Rivers, | Case No. 3:14 CV 2547 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Neil Turner, | |
| Defendant. | |

### INTRODUCTION

Pro se Plaintiff Doylan Rivers brought this action under 42 U.S.C § 1983 against seven Management & Training Corporation employees at the North Central Correctional Complex ("NCCC"): Correctional Officer Hunt, Sergeant and Manager of Housing Block Ms. Shaeffer, College Education Administrator Starks, Institutional Inspector Jane Doe, Deputy Warden of Special Services Joyce, Deputy Warden of Operations Norm Hills, and Warden Neil Turner.  Rivers says Defendants placed him in administrative segregation and transferred him to a different prison because he complained about how NCCC assigned jobs and awarded college scholarships.  Rivers alleges deprivations of his First, Eighth, and Fourteenth Amendment rights and a state law tort claim.

Defendants now move to dismiss (Docs. 25, 31); Rivers opposes (Doc. 28).

### BACKGROUND

Rivers is serving a life sentence for his role as an accomplice in a double murder.  *See State v. Smith*, 1994 WL 263233, at *1 (Ohio Ct. App.).  Currently incarcerated at Allen Oakwood

Correctional Institute ("ACI"), Rivers was housed at NCCC until December 2012. While at NCCC, Rivers learned that prison officials discriminated on the basis of race when assigning inmate jobs and awarding college scholarship funding (Doc. 26 at 13–14). Rivers is an African American and a leader of the prison's NAACP chapter.

Beginning in December 2011, Rivers complained to prison officials about this disparate treatment. In January 2012, Plaintiff met with Defendant Starks, Administrator of the College Education Program, to discuss Stark's failure to hire African Americans or award them scholarships (*id.* at 16). In February, Rivers met with NCCC Institutional Inspector Jane Doe. They discussed NCCC's alleged racial discrimination and Rivers' application for a "category 7" job, part of his effort to challenge NCCC's discrimination (*id.* at 17). Inspector Doe promised to take action (*id.*).

In the following weeks, Rivers wrote about the alleged disparate treatment in "kites," or prison correspondence, sent to NCCC's Recreation Supervisor, Religious Service Supervisor Dan Duskins, NCCC's Quartermaster Supervisor, and Deputy Warden of Special Services Joyce (*id.* at 18). Rivers also filed four complaints asking Deputy Warden Joyce to address NCCC's alleged racial discrimination. In his complaints, Rivers discussed his own experiences of discrimination (*id.* at 19).

After Rivers' meeting with Deputy Warden Joyce, Deputy Warden of Operations Hills met with Rivers. Rivers again discussed NCCC's treatment of African-American inmates, including Rivers himself (*id.* at 20). Rivers also met with Education Supervisor Shrine to discuss the college department's alleged discrimination (*id.*).

On March 13, Warden Turner and Deputy Warden Hills ordered Rivers placed in segregation (*id.* at 21). No prison official explained the housing placement to Rivers, and he received no conduct

report related to the transfer (*id.* at 21). On April 13, Rivers began a hunger strike "in protest of the retaliatory segregation placement" (*id.* at 26).

Several days later, NCCC officials transferred Rivers from segregation to the institution infirmary (*id.*). There, he spoke with Deputy Warden Hills about his placement in segregation (*id.* at 27). Deputy Warden Hills asked Rivers, "If I release you from segregation, will you stop causing problems?" and "Are you ready to stay out of the way?" (*id.*). NCCC officials released Rivers from segregation the next day (*id.*).

Rivers renewed his protests against NCCC's alleged racial discrimination upon his return to general population. Six days later, Rivers again met with Deputy Warden Joyce, who "upbraid[ed]" Rivers for his "stubbornness in continuing to pursue his grievances" (*id.* at 29). Deputy Warden Joyce called Rivers' complaints about racial discrimination "shenanigans," and concluded the meeting by saying, "You never learn! Go pack your stuff!" (*id.*). Rivers returned to segregation immediately following this conversation (*id.* at 29–30). Again, he received none of the process mandated by prison regulations for placement in segregation (*id.* at 31).

While in segregation, Rivers received only hot water in his cell during "the hottest summer recorded in U.S. history"; lived with an infestation of ants and spiders and sewage flooding from other inmates' cells; and inhaled pepper spray deployed "in the closed-in confines of the segregation unit" (*id.* at 32). During this time, Deputy Wardens Joyce and Hills ordered Personnel Officer Shaeffer to place Rivers' legal materials and personal property in the NCCC administration building, where they were lost or destroyed (*id.* at 34–35). Rivers lingered in segregation until December 2012, when Warden Turner ordered his transfer to ACI (*id.* at 33).

3

**STANDARD OF REVIEW**

A cause of action fails to state a claim upon which relief may be granted when it lacks "plausibility in [the] complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564 (2007). A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). The factual allegations in the pleading must be sufficient to raise the right to relief above the speculative level on the assumption that all the allegations in the complaint are true. *Twombly*, 550 U.S. at 555. A plaintiff need not include detailed factual allegations in the complaint, but "an unadorned, the-defendant-unlawfully-harmed-me accusation" will not suffice. *Iqbal*, 556 U.S. at 678. This Court construes the complaint's factual allegations in the light most favorable to the plaintiff. *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008).

**DISCUSSION**

Defendants move to dismiss the Amended Complaint. First, Defendants argue Rivers' First Amendment retaliation claim fails for lack of "protected activity" on Rivers' part (Doc. 25 at 12–14; Doc. 31 at 3–4), "adverse action" on Defendants' part (Doc. 25 at 14–15; Doc. 31 at 4–5), or a causal nexus between the two (Doc. 25 at 15; Doc. 31 at 5–7). Second, Defendants say Rivers' due process claims founder because (1) Rivers does not allege he suffered an "atypical and significant hardship" in transfer from general population to administrative segregation or from NCCC to ACI (Doc. 25 at 16–18; Doc. 31 at 7–8); (2) adequate state remedies exist to address the deprivation-of-property component of this claim (Doc. 31 at 8–9); and (3) his substantive due process claim merely duplicates his First Amendment claim (Doc. 25 at 18–19). Third, Defendants assert Rivers' equal protection claim fails because Rivers does not allege he personally experienced discrimination (Doc. 25 at

4

19–21; Doc. 31 at 9). Fourth, Defendants contend Rivers' Eighth Amendment claim fails as matter of law (Doc. 25 at 21–23; Doc. 31 at 9–10). Fifth, Defendants maintain that this Court should decline to exercise supplemental jurisdiction over Rivers' state-law deprivation-of-property claim (Doc. 25 at 23–24). And Sixth, Defendants assert that Rivers' transfer from NCCC moots his claims for declaratory and injunctive relief (Doc. 25 at 24–25; Doc. 31 at 12).

**Rivers Adequately Alleges a First Amendment Retaliation Claim**

*Protected Activity.* To state a retaliation claim, Rivers must first allege that he engaged in protected activity. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). A prisoner has a First Amendment right of access to courts, *Lewis v. Casey*, 518 U.S. 343, 346 (1996), which includes the "undisputed First Amendment right to file grievances against prison officials on his own behalf," *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010). But an inmate does not have an independent First Amendment right to assist others with their legal claims. *Thaddeus-X*, 175 F.3d at 395; *see Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993). Rather, "a 'jailhouse lawyer's' right to assist another prisoner is wholly derivative of that prisoner's right of access to the courts; prison officials may prohibit or limit jailhouse lawyering unless doing so interferes with [another] inmate's ability to present his grievances to a court." *Thaddeus-X*, 175 F.3d at 395; *see also Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000).

Defendants point to the "Notice of Grievance" attached to Rivers' original Complaint, showing that Rivers assisted inmate Williams in "exercising his rights to litigant [sic] matter" (Doc. 1-2, at 3; Doc. 25 at 12–14; Doc. 31 at 3–4). They argue this conduct is not protected. And indeed, Rivers' pleadings do not suggest that Williams needed Rivers' help to access the courts. *See*

5

*Thaddeus-X*, 175 F.3d at 395. Therefore, Rivers did not engage in protected conduct by assisting Williams.

But Rivers also submitted grievances personally. Rivers contends he, as an African American, was also discriminated against in job assignments, and gives specific instances of his application for inmate job assignments and subsequent exclusion because of his race (Doc. 26 at 15–20). Defendants point to the "Notice of Grievance" filed by Rivers later at ACI in January 2013 as proof that grievances Rivers submitted between January and March 2012 were not filed on his own behalf but on behalf of the prison population generally (Doc. 31 at 3). They contend these pleadings are contradictory and therefore Rivers has pled himself out of his claim (*id.*).

"[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012) (quoting *N. Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 454 (7th Cir. 1998)). But this Court finds no contradiction in Rivers' pleadings and exhibits. Rivers' "Notice of Grievance" asserts he "u[sed] the grievance procedure to address the systemic problem regarding racial discrimination in inmates job assignments" (Doc. 1-2 at 3). This alone does not contradict Rivers' allegation that his grievances also addressed instances of discrimination he suffered personally. Rivers has thus adequately pled that he engaged in protected activity.

*Adverse Action.* Rivers' pleadings also satisfy the adverse-action element of his retaliation claim. Contrary to Defendants' arguments, it is well established in the Sixth Circuit that transfer to administrative segregation may constitute an adverse action. *See, e.g., Thaddeus-X*, 175 F.3d at 396 ("In the prison context, an action comparable to transfer to administrative segregation would certainly

6

be adverse."); *Brown v. Crowley*, 312 F.3d 782, 789 (6th Cir. 2002); *Hill*, 630 F.3d at 474 (restricting a prisoner's housing by placing him in segregation constitutes an adverse action).

But to the extent Rivers argues that his transfer from the NCCC constitutes a separate act of retaliation by Defendants, his claim fails. Prisoners do not have a constitutional right to be incarcerated in any particular institution, *Ward v. Dyke*, 58 F.3d 271, 274 (6th Cir. 1995), and Rivers has not alleged that the transfer had collateral effects beyond a mere change of prison location, *cf. Siggers-El v. Barlow*, 412 F.3d 693, 702 (6th Cir. 2005). Accordingly, this portion of Rivers' Amended Complaint is dismissed.

***Causal Connection.*** Finally, Defendants argue Rivers has not shown his transfer to segregation resulted from his protected conduct. *See Hill*, 630 F.3d at 472. Evidence of temporal proximity between filing grievances and the adverse action provides some support for establishing retaliatory motive, particularly when accompanied by other evidence suggesting retaliatory intent. *See Hill*, 630 F.3d at 476; *Holzemer v. City of Memphis*, 621 F.3d 512, 526 (6th Cir. 2010) (citing *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010)).

Rivers alleges facts allowing an inference that his placement into administrative segregation arose at least in part from his protected activity. Rivers alleges Defendants Hills and Turner placed him into segregation within three weeks of his last written complaint (Doc. 26 at 19, 21). And in the infirmary following Rivers' first stay in segregation, Defendant Hills asked Rivers "Are you ready to stay out of the way?" and "If I release you from segregation, will you stop causing problems?" (*id.* at 27). Read in the light most favorable to Rivers, Hills' questions involved Rivers' earlier grievances concerning racial discrimination at the NCCC against himself and the general African-American population.

7

Moreover, Defendants did not subject Rivers to investigative interrogation, as is customary when inmates are placed into segregation (*id.* at 21). Rivers received no notice of charge, hearing, or opportunity to appeal (*id.*). This deviates from the "usual, prescribed procedure" and "was treatment different than that practiced for all other NCCC inmates" (Doc. 28 at 14). *See Thaddeus-X*, 175 F.3d at 399 (explaining that "disparate treatment of similarly situated individuals" may support an inference of retaliatory motive).

Rivers' second placement into segregation, six days after his first stay ended, directly followed an argument with Defendant Joyce, who "upbraid[ed] [Rivers] for his 'stubbornness' in continuing to pursue his grievances" (Doc. 26 at 29). Deputy Warden Joyce called Rivers' complaints "shenanigans," and concluded the meeting by saying, "You never learn! Go pack your stuff!" (*id.*). Prison officials returned Rivers to segregation immediately following this conversation (*id.*). He again received no customary notice, hearing, or opportunity of appeal (*id.* at 31). The Amended Complaint therefore properly alleges the retaliatory-motive element.

**Rivers Fails to State a Procedural Due Process Claim**

Defendants argue they did not violate Rivers' Fourteenth Amendment rights by transferring him to administrative segregation or by subjecting him to inhospitable conditions once there. In order to prevail on his Fourteenth Amendment procedural due process claim, Rivers must establish (1) that he enjoyed a protected "liberty" interest within the meaning of the Due Process Clause, and (2) that he was denied the process due him under the circumstances. *Thompson v. Ashe*, 250 F.3d 399, 407 (6th Cir. 2001).

An inmate has no liberty interest in avoiding transfer to more adverse conditions of confinement, *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005), unless the change in condition constitutes

8

an "atypical and significant hardship on the inmate in relation to ordinary incidents of prison life," *Sandin v. Conner*, 515 U.S. 472, 484 (1995). To determine whether a change in conditions is "atypical and significant," a court considers the duration and nature of the more restrictive confinement relative to "prison norms and to the terms of the individual's sentence." *Harden-Bey v. Rutter*, 524 F.3d 789, 792-93 (6th Cir. 2008). Confinement in administrative segregation rises to the level of "atypical and significant hardship" only in extreme circumstances. *See, e.g., id.* at 793 (allegation that prisoner has been indefinitely confined to segregation for more than three years potentially states a procedural due process claim); *Palmer v. Richards*, 364 F.3d 60, 64–65 (2d Cir. 2004) (holding that "[s]egregation of longer than 305 days . . . is sufficiently atypical to require procedural due process protection under *Sandin*"); *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000) (concluding that "eight years in administrative custody . . . is 'atypical' in relation to the ordinary incidents of prison life"); *cf. Mackey v. Dyke*, 111 F.3d 460, 463 (6th Cir. 1997) (117 day placement in segregation not "atypical and significant hardship" in context of inmate's life sentence).

Rivers fails to allege facts about the duration and nature of his segregation showing it to be an "atypical and significant hardship." While Rivers spent approximately eight and a half months in segregation (Doc. 26 at 21, 26, 30, 33), courts routinely hold that confinement to segregation for even longer periods does not impose an "atypical and significant hardship," *see, e.g., Jones v. Baker*, 155 F.3d 810, 813 (6th Cir. 1998) (two-and-a-half-year placement in segregation not "atypical and significant hardship"); *Griffin v. Vaughn*, 112 F.3d 703, 708 (3d Cir. 1997) (fifteen months of segregation not "atypical and significant hardship").

And although the conditions of Rivers' segregation were certainly regrettable, he has not alleged facts describing the conditions of his confinement prior to segregation. He therefore provides

no basis for this Court to conclude the conditions of his confinement worsened. Rivers, not the court, bears the burden of alleging facts sufficient to conduct a *Sandin* analysis. *Williams v. Lindamood*, 526 F. App'x 559, 562–63 (6th Cir. 2013).

### Rivers Fails to State a Constitutional Deprivation-of-Property Claim

Defendants next contend that this Court should dismiss Rivers' Fourteenth Amendment deprivation-of-property claim because adequate state-law remedies exist to address the alleged deprivation (Doc. 31 at 8). A "deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause . . . if a meaningful [state] postdeprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984).

Rivers alleges that no state-law remedies exist for him to recover his allegedly unlawfully taken property (Doc. 26 at 37). But he conflates the Court of Claims' lack of subject-matter jurisdiction over claims against privately owned prisons, *see Norman v. Lake Erie Correctional Inst.*, 2003-Ohio-1118, at 18 (Ohio Ct. Cl.), with a total absence of state-law remedies. Rivers, himself, has raised a state-law tort claim against Defendants (Doc. 26 at 54), and his Amended Complaint fails to address why a state tort remedy for conversion would not redress his injury, *see Fox v. Van Oosterum*, 176 F.3d 342, 349 (6th Cir. 1999). Because adequate state remedies exist, no due process violation occurred.

### Rivers Adequately Alleges an Equal Protection Claim

Defendants argue Rivers' equal protection claim warrants dismissal because "the allegations in the Amended Complaint fail to show any support for Plaintiff's assertion that he personally applied for job assignments and college scholarships" (Doc. 31 at 9). A Section 1983 plaintiff advancing an equal protection theory must allege that a state actor intentionally discriminated against him because

10

of his membership in a protected class. *Herron*, 203 F.3d at 417. Rivers is African American, a protected class (Doc. 26 at 19), and has alleged he and other African Americans at the NCCC were denied job assignments because of their race. Rivers describes three of his own attempts to obtain a job: first, he applied for a "category 7 job assignment" as part of his protest against alleged racial discrimination (*id.* at 17); second, his application for an inmate job with Starks was denied (*id.* at 18); and third, he applied for a job with Joyce and was denied access to a "Special Service" area because he was "an African-American NAACP member" (*id.* at 19).

To show these denials were based on his race, Rivers offers specific instances of Defendants' racially discriminatory conduct. Starks, the Administrator of the College Program at NCCC, admitted she had not recommended a single African American for college scholarships and employed no African Americans in her department (Doc. 26 at 16). Further, Rivers alleges that NCCC's Institutional Inspector admitted NCCC was out of compliance with the Ohio Department of Rehabilitation and Correction's non-discrimination policy (*id.* at 17). The Amended Complaint thus describes sufficiently specific conduct to allege an equal protection claim.

### Rivers' Substantive Due Process and Eighth Amendment Claims Fail

Defendants argue that Rivers' failure to raise arguments in support of his substantive due process and Eighth Amendment claims in his Memorandum in Opposition merits dismissal of those claims. Rivers failed to respond to Defendants' arguments in his "Response to Plaintiff's Amended Complaint" (Doc. 28), and thus waived any opposition to the Motion to Dismiss. *See Humphrey v. U.S. Attorney Gen. Office*, 279 Fed. App'x 328, 331 (6th Cir. 2008); *Scott v. Tennessee*, 878 F.2d 382, 1989 WL 72470, at *2 (6th Cir. 1989) ("[I]f a plaintiff fails to respond or to otherwise oppose a defendant's motion, then the district court may deem the plaintiff to have waived opposition to the

11

motion."). Further, this Court finds Defendants' arguments on the merits of Rivers' due process and Eighth Amendment claims well-taken, and thus dismisses those claims for the reasons described in Defendants' Motion (*see* Doc. 25 at 18–19, 21–23).

### Rivers Properly Alleges a State-Law Deprivation-of-Property Claim

Defendants argue this Court should decline to exercise jurisdiction over Rivers' state-law deprivation-of-property claim (Doc. 31 at 11–12). But a district court may exercise supplemental jurisdiction under 28 U.S.C. § 1367 over a state-law claim if that claim is "so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009). As Rivers' retaliation and equal protection claims survive dismissal, his state-law claim properly remains before this Court.

### Rivers' Claim for Declaratory and Injunctive Relief is Moot

A claim for declaratory and injunctive relief may proceed against a state official sued in his official capacity. *See Hafer v. Melo*, 502 U.S. 21, 27 (1991). Here, Rivers seeks to enjoin Defendants from violating his First and Fourteenth Amendment rights (Doc. 26 at 10). But as Rivers is no longer incarcerated at NCCC (*id.* at 33) and he does not allege his constitutional rights are being violated at ACI, his claims for declaratory and injunctive relief are moot. *Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010).

### CONCLUSION

For the above reasons, this Court grants Defendants' Motion to Dismiss (Doc. 25) as to Rivers' (1) First Amendment retaliation claim as it relates to Rivers' transfer from NCCC; (2) due process claims; (3) Eighth Amendment claim; and (4) demand for declaratory and injunctive relief.

This action shall proceed on Rivers' First Amendment retaliation claim against Defendants Turner, Hills, Joyce, Starks and Institutional Inspector Jane Doe for Rivers' placement in administrative segregation, Rivers' Fourteenth Amendment Equal Protection claim against Defendants Turner, Hills, Joyce, and Shaeffer, and Rivers' state-law deprivation-of-property claim against Defendants Turner, Hills, Joyce, Starks, Institutional Inspector Jane Doe, Hunt and Shaeffer.

IT IS SO ORDERED.

       s/ *Jack Zouhary*
   JACK ZOUHARY
   U. S. DISTRICT JUDGE

September 15, 2015